AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Northern District of California

| United States of America | ) | |
|---|---|---|
| v. | ) | **EDL** |
| | ) | Case No. 3 12 7087 |
| JORGE CHAVEZ | ) | |
| | ) | |
| | ) | |
| _Defendant(s)_ | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___January 11 - February 7, 2012___ in the county of ___San Mateo___ in the
___Northern___ District of ___California___ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute Cocaine |
| 21 USC § 843(b) | Use of a Telephone in Connection with a Drug Trafficking Crime |
| 21 U.S.C. § 846 | Conspiracy to Possess with Intent to Distribute Cocaine |
| | Max. penalties: 40 years' imprisonment; 5 year minimum term of imprisonment; $5 million fine; lifetime supervised release; 4 year minimum term of supervised release; $100 special assessment |

This criminal complaint is based on these facts:

Please see the attached affidavit of FBI Special Agent Matthew Beaupain.

(Approved as to form: _____ AUSA Kevin J. Barry)

☑ Continued on the attached sheet.

_____
_Complainant's signature_

Matthew Beaupain, Special Agent, FBI
_Printed name and title_

Sworn to before me and signed in my presence.

Date: __Aug 2, 2012__

_____
_Judge's signature_

City and state: ___San Francisco, CA___

Hon. Elizabeth D. Laporte, U.S. Magistrate Judge
_Printed name and title_

## AFFIDAVIT IN SUPPORT OF
## CRIMINAL COMPLAINT

I, Matthew S. Beaupain, Special Agent, Federal Bureau of Investigation (FBI), first being duly sworn, do depose and state:

### I.    INTRODUCTION

1.    I make this affidavit in support of a criminal complaint against Jorge CHAVEZ (hereafter "CHAVEZ") for violations of Title 21, United States Code, Section 841(a)(1), distribution and possession with intent to distribute a controlled substance, Title 21, United States Code, Section 843(b), use of a communications facility to facilitate narcotics trafficking activities, and Title 21, United States Code, Section 846, conspiracy to distribute and possess with intent to distribute a controlled substance.

2.    The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, my review of documents and computer records related to this investigation, communications with others who have personal knowledge of the events and the circumstances described herein, and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of a complaint, it does not set forth each and every fact that I, or others, have learned during the course of the investigation.

### II.    AGENT BACKGROUND

3.    I am a Special Agent (SA) of the United States Department of Justice, Federal Bureau of Investigation (FBI), and have been so employed since November of 2005. I am currently assigned to the San Francisco Field Division of the FBI, and I investigate cases involving violent gangs, drug trafficking, and violent fugitives. I have received training at the FBI Academy in Quantico, Virginia, including training on violent street gangs, criminal case management, informant development, Title III investigations and the identification, use, packaging and sales of

controlled substances. I have participated in numerous local and federal search warrants and
arrests involving alleged narcotics trafficking, and I have participated in numerous investigations
of narcotics traffickers and violent street gangs. I have been the Affiant on previous Title III
investigations involving narcotics traffickers and violent street gangs. These investigations have
involved, but were not limited to, the use of confidential informants, wire and physical
surveillance, Title III, consensual wire interception (Title II), telephone toll analysis,
investigative interviews, and the service of search and arrest warrants.

4.      I have interviewed numerous gang members, drug dealers, drug users, and
knowledgeable confidential informants about the lifestyles, appearances, and habits of drug
dealers, users, and criminal street gang members and associates. I have become familiar with the
manner in which narcotics traffickers smuggle, package, transport, store, and distribute narcotics,
as well as how they collect and launder drug proceeds. I am also familiar with the manner in
which gang members and narcotics traffickers use telephones, cellular telephone technology,
intentionally vague language, coded communications and slang-filled conversations, false and
fictitious identities, and other means to facilitate their illegal activities and to thwart law
enforcement investigations. I have had discussions with other law enforcement personnel about
the packaging and preparation of narcotics, the distribution methods of illegal narcotics
traffickers, and the security measures that gang members, associates, and narcotics traffickers
often employ. I have also examined documentation of various methods by which crystal
methamphetamine, cocaine, crack cocaine, heroin, marijuana, and other illicit drugs are
smuggled, transported, and distributed. I have participated in numerous acts of surveillance of
gang members and narcotics traffickers. During these acts of surveillance, I have personally
observed narcotics transactions, counter-surveillance techniques, and the ways in which narcotics
traffickers conduct clandestine meetings. I have participated in other investigations that involved
the interception of wire communications, and I have been directly involved in the review and
deciphering of intercepted coded conversations between gang members, associates, and narcotics
traffickers that were later corroborated by surveillance, seizures, or defendants' statements.

5.     I have received formal training at the FBI's Basic Agent Training in Quantico, Virginia. During this four-month course, I received several hundred hours of instruction in law enforcement investigations, including the identification, use, packaging, and sales of controlled substances. I have also attended numerous training schools and seminars related to gang and narcotics investigations, including actual training on "cooking" crack cocaine and heroin in a controlled training environment. I have also been trained and provided instruction on drug trafficking methods, money laundering methods, and techniques for investigating those crimes. Throughout my law enforcement career, and as part of my participation in this investigation, I have spoken with, worked with, and gained knowledge from numerous experienced federal, state, and local investigators. I am one of the case agents participating in the investigation of CHAVEZ, and others, for narcotics trafficking offenses.

## III.     APPLICABLE LAW

6.     Title 21, United States Code, Section 841(a)(1), distribution and possession with intent to distribute a controlled substance, Title 21, United States Code, Section 843(b), use of a communications facility to facilitate narcotics trafficking activities, and Title 21, United States Code, Section 846, conspiracy to distribute and possess with intent to distribute a controlled substance.

## IV.     BACKGROUND OF INVESTIGATION

7.     East Menlo Park, California, a/k/a, Belle Haven, is adjacent to East Palo Alto (EPA), California. The two areas combined are approximately three square miles. Both East Menlo Park and EPA are located in San Mateo County on the peninsula south of San Francisco. There are several criminal street gangs that claim territory in or near, and operate within, East Menlo Park and EPA, including, but not limited to, the Taliban Street Gang (TSG), Anybody Can Get It Gang (ABCG), Yellow Tape Gang (YTG), Menlo-Mid-Town (M&M), Da Village Street Gang (Da Vill), G-Town Street Gang (G-Town), and the Sacramento Street Gang (SSG). These gangs engage in narcotics trafficking and acts of violence. Although these criminal street gangs claim East Menlo Park and EPA, and/or nearby areas as their territory, members and associates of these gangs commit crimes in other parts of the San Francisco Bay Area including San Mateo County (Daly City, San Mateo, Redwood City), Alameda County

1

(Oakland, Fremont, Hayward, San Leandro, Union City), Santa Clara County (San Jose, Mountain View, Palo Alto), San Francisco County, and San Joaquin County (Stockton). Members and associates have also been involved in crimes in other states outside of California, including New York, Louisiana, Georgia, Washington State, Nevada, and Texas.

8.      On January 4, 2012, the Honorable Richard Seeborg, District Court Judge for the Northern District of California, signed an order authorizing the interception of wire communications occurring over Target Telephone Four, (650) 776-0727 (**TT-4**) used by Joseph WILLIAMS for a 30-day period. Numerous conversations were intercepted between WILLIAMS and CHAVEZ. Call summaries were prepared by agents and officers contemporaneously with the calls intercepted on **TT-4**, and then transcribed at a later date. Although care was taken to ensure the accuracy of the call summaries and transcripts, subsequent review of the summaries and transcripts may result in slight changes to the transcript, summaries, or my analysis of the content of the conversations.

9.      I believe that WILLIAMS, CHAVEZ, and WILLIAMS' customers and associates used coded language in order to conceal the true nature of their conversations. Therefore, in an attempt to explain the conversations detailed in this Affidavit, I have expressed my opinions regarding the nature of these conversations. My opinions are not facts and are based on my training and experience and my discussions with other law enforcement officers familiar with narcotics trafficking investigations.

## V.    FACTS ESTABLISHING PROBABLE CAUSE

### A.    Calls Between TT-4 and Jorge CHAVEZ Regarding Suspected Narcotics Trafficking

10.     On January 11, 2012, at approximately 4:40 p.m., an incoming call from (415) 559-2198 (believed to be utilized by CHAVEZ) to TT-4 was intercepted (Session 194). WILLIAMS asked CHAVEZ, "What's up with it?" CHAVEZ responded, "Shit, waiting, waitin." WILLIAMS asked, "Waiting, huh?" CHAVEZ said, "It's dry blood." WILLIAMS asked, "Dry?" CHAVEZ responded, "Yep, you finish those? ("Those" kilograms of cocaine previously supplied to WILLIAMS by CHAVEZ)" WILLIAMS said, "Just about." CHAVEZ said, "We should be, we should hopefully

2

blood. I'm waiting on my boys in San . . ." CHAVEZ continued, "Alright, well let me get it. My boy should be good. So I'm just waiting on him." WILLIAMS said, "Ah blood, you, come on blood." CHAVEZ said, "That day you told me it was him but the woo-whop (cocaine) didn't come through." WILLIAMS said, "Alright, you fuckin' up." CHAVEZ told WILLIAMS, "I'm gonna hit you as soon as, you know, cause he had told me probably that hopefully tomorrow."

11.    Based on my training and experience and the content of the telephone call, I believe that WILLIAMS was asking CHAVEZ if CHAVEZ had any cocaine. CHAVEZ told WILLIAMS that "It's dry," that he's "waiting," and that "the woo-whop didn't come through." I believe CHAVEZ was telling WILLIAMS that he didn't have any cocaine, that he was waiting on his source of supply and that his source of supply hadn't come through with any cocaine yet.

12.    On January 13, 2012, at approximately 2:15 p.m., an incoming call from (415) 559-2198 to TT-4 was intercepted (Session 318). WILLIAMS asked, "We must be on the shelf still, huh?" CHAVEZ responded, "Blood, this nigga just got me waiting." WILLIAMS said, "Oh, alright." CHAVEZ said, "I'm gonna hit you blood but hopefully they saying tomorrow." Later in the conversation, WILLIAMS said, "I'm broke blood." CHAVEZ responded, "Nigga we on the same page. Let me go get put my skills to work, blood we got to make this happen."

13.    Based on my training and experience and the content of the telephone call, I believe that WILLIAMS was asking CHAVEZ if he had gotten any cocaine yet. CHAVEZ was saying that he was still waiting and that he would try to make a deal happen.

14.    On January 15, 2012, at approximately 11:19 a.m., an outgoing call from TT-4 to (415) 559-2198 was intercepted (Session 446). WILLIAMS told CHAVEZ, "Shit, y'all killing the operation. Blood, I ain't got . . ." CHAVEZ responded, "Huh?" WILLIAMS said, "Y'all killing the operation. I ain't got nothing." CHAVEZ said, "Blood, I'm waiting too. There ain't nothing nowhere." WILLIAMS responded, "Damn, blood." CHAVEZ said, "I check with like, three of my boys blood, they like hold on, hold on, tomorrow tomorrow." Later in the conversation, CHAVEZ told WILLIAMS, "Blood, Imma go dig right now again blood, I'm diggin', don't . . . you know."

3

15. Based on my training and experience and the content of the telephone call, I believe that WILLIAMS was telling CHAVEZ that he doesn't have any cocaine and that a lack of a resupply from CHAVEZ was messing up WILLIAMS' drug dealing business. I believe that CHAVEZ was telling WILLIAMS that he was trying to locate cocaine for WILLIAMS and that he had tried multiple sources without any luck.

16. On January 15, 2012, at approximately 4:29 p.m., an incoming call from (415) 559-2198 to TT-4 was intercepted (Session 491). Towards the end of the conversation, CHAVEZ said, "Hey, my people, uh, uh, I hit both of 'em, they talkin' bout a day or two at the, you know, at the latest." WILLIAMS responded, "Oh, aight." CHAVEZ told WILLIAMS, "So just hold on tight."

17. Based on my training and experience and the content of the telephone call, I believe that CHAVEZ was telling WILLIAMS that he talked to his cocaine supplier and that they would be ready to deal in a day or two.

18. On January 17, 2012, at approximately 10:14 a.m., an outgoing call from TT-4 to (415) 559-2198 was intercepted (Session 596). WILLIAMS asked, "What's up, it ain't looking good for them one's either?" CHAVEZ responded, "Uh, not yet." CHAVEZ later said, "I'm going to call you blood. He said yesterday they were here but I guess they didn't come in . . . Yesterday he called me he was like them sharks (police) around so I was like alright, but he called me back he uh . . ." WILLIAMS responded, "You keeping me on hold too long now man." CHAVEZ said, "I know blood but it should be here." WILLIAMS said, "My business is going to go down blood." CHAVEZ responded, "It's going to be him blood." WILLIAMS said, "Too many days it go bad blood so you need to hurry up alright?"

19. Based on my training and experience and the content of the telephone call, I believe that CHAVEZ was telling WILLIAMS that the cocaine hadn't come in. WILLIAMS was telling CHAVEZ that his business was suffering due to delay in getting cocaine and that CHAVEZ needed to hurry up.

20. On January 22, 2012, at approximately 10:56 a.m., an outgoing call from TT-4 to (415) 559-2198 was intercepted (Session 929). WILLIAMS asked, "What's up man, you got that today or what?"

4

CHAVEZ responded, "Yup, I'm just waiting for my boy to get up." WILLIAMS said, "Ahh man." CHAVEZ responded, "I called him right now, he hasn't got up yet." WILLIAMS said, "Alright." CHAVEZ said, "But it's for sure though." WILLIAMS asked, "Well is it coming through today for sure or what?" CHAVEZ responded, "Yep, that's what he said so I'm waiting for him to get up."

21. Based on my training and experience and the content of the call, I believe that CHAVEZ was telling WILLIAMS that his source of supply had the cocaine and that CHAVEZ was just waiting for the source to wake up so that CHAVEZ could get it.

## B. January 24, 2012, Suspected Narcotics Transaction

22. On January 24, 2012, at approximately 10:08 a.m., an incoming call from (415) 559-2198 (believed to be utilized by Jorge CHAVEZ, WILLIAMS' suspected cocaine supplier) to TT-4 was intercepted (Session 1097). CHAVEZ said, "Meet me at your pop's (1340 Camellia Drive, East Palo Alto, California[1]) like in fifteen minutes." WILLIAMS said, "Yeah, I'm coming from a, I'm coming down Palo Alto from Embarcadero right now. I'll be there."

23. At approximately 10:30 a.m., CHAVEZ was observed via pole camera parking a 1999 gray Chevrolet S-10 bearing California license plate 5Y33648 (the SUBJECT VEHICLE)[2] in the driveway of 1340 Camellia Drive behind WILLIAMS' white Jeep Grand Cherokee bearing California license plate 6POG049.

24. At approximately 10:48 a.m., an incoming call from (650) 804-6248 (believed to be utilized by Monique BURNS) to TT-4 was intercepted (Session 1105). WILLIAMS said, "Hey, can you do a big favor at all or you got to go right back to work?" BURNS responded, "Uh huh." WILLIAMS asked, "Huh you going home?" BURNS said, "I said I could do you a big favor." WILLIAMS said, "Go home

---

[1] 1340 Camellia Drive is where Benjamin WILLIAMS lives. Benjamin WILLIAMS is Joseph WILLIAMS' uncle. Joey WILLIAMS, the father of Joseph WILLIAMS, also frequents the residence. During the course of the Title III investigation, agents observed via a pole camera, dozens of suspected narcotics transactions at 1340 Camellia Drive.

[2] 5Y33648 is registered to Victoria VALENCIA, 2839 Fordham Street, East Palo Alto, California.

and get this money for me real quick." BURNS said, "Ok." WILLIAMS said, "If you going home, but you going home anyway?" BURNS responded, "I'm almost at home." WILLIAMS said, "So if you're at home get this money, get twenty two five, so five, ten, fifteen, twenty right?" BURNS said, "Uh-huh." WILLIAM said, "Just get twenty two thousand out of there." BURNS asked, "Twenty two?" WILLIAMS said, "Twenty two so that's going to be, make sure you get four stacks and make sure there's five in each one." BURNS said, "Ok." WILLIAMS said, "So just get four of them rubber band stacks they five thousand in each one. You already know right?" BURNS said, "Ok." WILLIAMS said, "So bring twenty two. Bring me twenty two." BURNS asked, "Ok where am I meeting you at because you know I gotta get back to work." WILLIAMS said, "Uh, shit I guess I'm going to have to just meet you over there by the uh by the uh right there." BURNS said, "I can't go to Shell you got to meet me by Town and Country." WILLIAMS said, "Alright." BURNS said, "Because I can't go to Shell babe I gotta l gotta wash up." WILLIAMS said, "Ok, I'll meet you by Town and Country. Just call me when you ah you know so I come meet you." Burns said, "Ok."

25.    Based on my training and experience and the content of the call, I believe that WILLIAMS was asking BURNS to go back to their home (2041 W. El Camino Real, Apt. 110, Mountain View, California 94040), get $22,000, and then deliver the money to WILLIAMS at the Town and Country shopping center. I know from my training and experience that a kilogram of cocaine costs approximately $22,000.

26.    At approximately 11:08 a.m., CHAVEZ was observed via pole camera moving the gray Chevrolet from the driveway of 1340 Camellia Drive and parking it on the opposite side of the street. At approximately 11:10 a.m., CHAVEZ was observed via pole camera getting into the passenger seat of the white Jeep. WILLIAMS (driving) and CHAVEZ then departed 1340 Camellia Drive in the white Jeep.

27.    At approximately 11:11 a.m., the white Jeep turned left onto Pulgas Avenue from Camellia Drive and then south on East Bayshore Road. The white Jeep then turned right onto Embarcadero Road. At approximately 11:15 a.m., the white Jeep arrived at the Town and Country shopping center on the corner of Embarcadero Road and El Camino Real in Palo Alto. At approximately 11:18 a.m., the white

6

Jeep parked in the parking lot near the Jamba Juice store. WILLIAMS and CHAVEZ were observed stopping briefly at a car parked in the parking lot before entering the Jamba Juice.

28.     At approximately 11:18 a.m., an incoming call from (650) 804-6248 to TT-4 was intercepted (Session 1110). WILLIAMS said, "I'm at Jamba Juice stop right in front of Jamba Juice." BURNS said, "Ok."

29.     At approximately 11:19 a.m., WILLIAMS exited Jamba Juice. At approximately 11:20 a.m., a blue BMW bearing California license plate 5ZCF342[3] entered the Town and Country parking lot and stopped near Jamba Juice. WILLIAMS met the blue BMW on foot and was seen at the driver's side window holding a brown paper bag with handles. The blue BMW departed the parking lot at approximately 11:22 a.m. Agents observed a black female driving the blue BMW. Based on my training and experience, I believe that BURNS delivered the money to JOSEPH in the brown paper bag.

30.     At approximately 11:24 a.m., WILLIAMS and CHAVEZ departed the parking lot in the white Jeep traveling east on Embarcadero Road, then north on East Bayshore Road. At approximately 11:31 a.m., the white Jeep stopped at the Garden Market convenience store on Pulgas Avenue. At approximately 11:34 a.m., the white Jeep was observed via the pole camera parking on the street in front of 1340 Camellia Drive. CHAVEZ got out of the white Jeep, entered the gray Chevrolet and parked it in the driveway of 1340 Camellia Drive. WILLIAMS exited the white Jeep and retrieved the brown paper bag from the back seat of the Jeep. CHAVEZ and WILLIAMS then both went inside 1340 Camellia Drive.

31.     At approximately 11:47 a.m., TT-4 made an outgoing call to an unidentified male (UM1) at (650) 814-9917 that was intercepted (Session 1114). UM1 said, "Good news?" WILLIAMS said, "Shit, he only brought one (kilogram of cocaine) it's good but he say tomorrow shit he bring some more." UM said, "Alright."

32.     Based on my training and experience and the content of the call, I believe that WILLIAMS was

---

[3] 5ZCF342 is registered to Suzette Alexandra SMITH, 2041 El Camino Real, Apartment 110, Mountain View, California.

telling UM1 that CHAVEZ only supplied WILLIAMS with one kilo of cocaine.

33.     At approximately 11:53 a.m., TT-1 made an outgoing call to (650) 462-1507, believed to be utilized by Donald POSTON, that was intercepted (Session 1116). WILLIAMS said, "Hey hello? Big A (Alfie HERMAN)." HERMAN said, "Hey, what's up?" WILLIAMS asked, "Don there?" HERMAN said, "Yeah." POSTON then got on the line and said, "What's up row?" WILLIAMS said, "Anybody hit you you tell them it's good." POSTON said, "Ahhhh." WILLIAMS said, "I'm at work right now. I letting you know anybody hits you tell them it's good." POSTON responded, "Alright."

34.     Based on my training and experience and the content of the call, I believe that WILLIAMS is telling POSTON to tell any customers that call POSTON that they have been resupplied and that they had crack cocaine available. I believe that WILLIAMS told POSTON that WILLIAMS was cooking the cocaine into crack cocaine while they were talking on the phone.

## C.     January 26, 2012, Suspected Narcotics Transaction

35.     On January 26, 2012 at approximately 11:59 a.m., an incoming call from (415) 559-2198 to TT-4 was intercepted (Session 1240). CHAVEZ asked, "Ready?" WILLIAMS said, "Yep. Wait, what's the number? How many?" CHAVEZ said, "Um, them tray (three kilograms). I told you." After a brief discussion about where to do the deal, CHAVEZ said, "Yeah, make it uh, you wanna do yours at your house let's those other two then we'll go do yours afterwards." WILLIAMS responded, "Do what other two? You only got three?" CHAVEZ said, "Oh well, you gonna get all three of them?" WILLIAMS said, "Nah, I'm getting two then you gonna do one with him."

36.     Based on my training and experience and the content of the call, I believe that CHAVEZ and WILLIAMS were discussing how many kilos of cocaine that WILLIAMS was going to get from CHAVEZ. I believe this deal was what WILLIAMS was referencing in his conversation on January 24, 2012 (Session 1114). WILLIAMS told CHAVEZ that WILLIAMS was buying two kilos and that CHAVEZ was going to sell a third to another customer.

37.     At approximately 12:03 p.m., an outgoing call from TT-4 to (415) 559-2198 was intercepted

(Session 1241). WILLIAMS said, "Yeah, so what you gonna do? Go to my house or what?" CHAVEZ said, "Yeah, where you want to meet at, your spot or or or." WILLIAMS said, "Yeah, I said you wanna go to my house first and then go to his?" CHAVEZ said, "Yeah." WILLIAMS said, "So shit, how long I'm gonna just meet you down there you about to be on your way to Mountain View?" CHAVEZ said, "Yeah give me like about forty minutes."

38.     Based on my training and experience and the content of the call, I believe that WILLIAMS and CHAVEZ agreed to conduct the narcotics transaction at WILLIAMS' home at 2041 W. El Camino Real, Apartment 110, Mountain View, California 94040.

39.     At approximately 12:48 p.m., surveillance agents saw CHAVEZ park the gray Chevrolet in the front parking lot at 2041 W. El Camino Real. At approximately 1:00 p.m., WILLIAMS drove his white Jeep into the gated parking area on the south side of 2041 W. El Camino Real. CHAVEZ followed WILLIAMS through the gate in the gray Chevrolet. WILLIAMS and CHAVEZ were observed walking from the parking area towards the residence at 2041 W. El Camino Real. Surveillance agents could not see WILLIAMS and CHAVEZ actually enter 2041 W. El Camino Real. CHAVEZ was carrying a red paper bag.

40.     At approximately 1:36 p.m., an incoming call to TT-4 from (415) 374-3595 was intercepted (Session 1253). During that call WILLIAMS said, "I'm comin' from Mountain View, blood. I be down there in like fifteen, twenty minutes." Also at approximately 1:36 p.m., CHAVEZ' telephone was located at 37.3944 N latitude and 122.1003 W longitude. Those coordinates closely coincide with 2041 W. El Camino Real.

41.     At approximately 1:44 p.m., an outgoing call from TT-4 to (650) 804-6248 was intercepted (Session 1255). In the background a person can be heard counting. WILLIAMS said, "It's all there, blood."

42.     Based on my training and experience, I believe that the person in the background was counting money involved in the narcotics transaction and that when WILLIAMS said "It's all there, blood" he was talking to the person counting and not to the person who he called.

9

43.     At approximately 1:57 p.m., an incoming call to TT-4 from (650) 804-6248 was intercepted (Session 1261). BURNS was calling to make sure that WILLIAMS left the door open at 2041 W. El Camino Real, Apt. 110, Mountain View, California 94040. WILLIAMS said, "Lucky you did call, though. Movin' hella fast, I locked the door back. You know I did, cause I was just in there woo woo woo. So you know I was, you know I locked that muthafucka, I wasn't even trippin. Me and him (CHAVEZ) left out together."

44.     Based on my training and experience and the content of the call, I believe that WILLIAMS told BURNS that he locked the door at the apartment because he left quickly with CHAVEZ after conducting the narcotics transaction.

45.     At approximately 5:13 p.m., an incoming call to TT-4 from (650) 804-6248 was intercepted (Session 1287). During the conversation between WILLIAMS and BURNS, WILLIAMS switched over to a second line and spoke to the unidentified male (UM1) that WILLIAMS was trying to connect with CHAVEZ for a suspected narcotics transaction. UM1 said, "Aye, if it mean anything to him, I'll do the fever tonight." WILLIAMS said, "Nah, he already, he, he bout to leave, it don't matter, he said dude ain't, he ain't got em on line, his dude ain't comin back, right now. The dude who got 'em ain't movin. It ain't him, you feel me?" UM1 said, "Damn." WILLIAMS said, "That's what I'm sayin'. It ain't him, It's dude who got 'em." UM1 said, "Ahh, yea. Aight. Dude gon move or somethin' or just?" WILLIAMS said, "Tomorrow, for me ro. That's what he say. His boy gon woo woo tomorrow, have them tomorrow, that's what he tell me."

46.     Based on my training and experience and the content of the call with UM1, I believe that WILLIAMS was telling UM1 that CHAVEZ's source didn't have the cocaine today but would have it ready tomorrow. I believe when WILLIAMS says "woo woo" it means engage in a narcotics transaction.

47.     WILLIAMS then switched the line back to his conversation with BURNS (Session 1287). WILLIAMS said, "Nah, I was sayin', I was, I think I was sayin' that fuckin', oh, Fig sayin' that nigga trippin', because I was supposed to get him some of them from my boy, and then now my boy said it's

10

bad, but he leavin', but he keep sayin' this and that, but all the ones he got, I got. Like I'm sayin', remember?" BURNS said, "Yes." WILLIAMS said, "And he never came back through, but he said he was. And he had me tellin' him this. That's why I tell him, don't tell me, have me tellin' nobody nothin' man, I don't be likin' that. You gon come through, you is or you ain't. Don't have me say, tell him tomorrow, then tell me mornin', then tell him this way, that way. Then muthafuckas be mad cause I got mines and I ain't give nuthin' to them." BURNS said, "I know, but you can't..." WILLIAMS said, "I'm sayin', I can't make it happen all the time, I gotta make it happen for myself, all the time." BURNS said, "Yeah." WILLIAMS said, "Other than that, he gotta wait. Gotta just understand. Can't be, he'll he'll keep callin' me. Thinkin', nah, it ain't me, it's him." BURNS said, "Exactly. Shit, you you, usually give them, sellin' all them muthafuckas , so you can't yo money. And makin' you some, you wouldn't give a fuck." WILLIAMS said, "Yeah, exactly. Basically, yeah." BURNS said, "Especially not to him. I mean, you know, it's like, you might, shit. You know, you'll get, look out for him for sure, cause I remember you saying that. If they get some, Imma look out for him."

48.    Based on my training and experience and the content of the call, I believe that WILLIAMS was telling BURNS that he was frustrated that UM1 was calling WILLIAMS asking about the cocaine that CHAVEZ was supposed to deliver to UM1 (see call session 1240 above). BURNS was agreeing with WILLIAMS' frustration.

### D.    Initial Misidentification of Jorge CHAVEZ

49.    As set forth in the paragraphs above, I believe that CHAVEZ was communicating with WILLIAMS about drug trafficking. Earlier in this investigation, however, agents believed that a different individual was making the calls described above, a person named JESUS SEGURA (hereafter SEGURA).

50.    In 2009, agents recorded telephone calls of SEGURA conducting narcotics transactions with DESEAN GARDNER as part of another investigation. When agents intercepted the calls discussed above, they compared the 2009 recordings of SEGURA with the intercepted telephone calls between telephone number (415) 559-2198 and TT-4 discussed above. FBI Special Agents who were involved

11

with the 2009 investigation compared the 2009 known voice of SEGURA and the voice utilizing telephone number (415) 559-2198 and believed it was the same voice, that of SEGURA. However, later investigation determined that CHAVEZ was utilizing (415) 559-2198.

51.     On January 19, 2012, the Honorable Jacqueline Scott Corley, Magistrate Judge for the Northern District of California, signed an order authorizing Agents of the FBI to obtain location data concerning the telephone assigned phone number (415) 559-2198 for a period of 30 days.

52.     On January 20, 2012, at approximately 1:04 p.m., CHAVEZ had a telephone conversation with WILLIAMS. At approximately 1:09 p.m., CHAVEZ's telephone was located within six meters at 37.40942 N latitude and 121.8674 W longitude. Those coordinates closely coincided with 1830 Wembley Court, San Jose, CA.

53.     A public database query showed SEGURA as being associated with 1830 Wembley Court. The Pacific Gas and Electric Company's account for 1830 Wembley Court listed SEGURA's name.

54.     On January 20, 2012, agents initiated surveillance at 1830 Wembley Court at approximately 1:55 p.m. Surveillance agents observed 1999 gray Chevrolet S-10, bearing California license plate number 5Y33648 (the SUBJECT VEHICLE) in the driveway at 1830 Wembley Court and second car, a white Nissan Maxima bearing California license plate 6LFC138, park in a parking spot directly south of 1830 Wembley Court. At approximately 3:10 p.m., a Hispanic male, later identified as Francisco SEGURA, SEGURA's brother, exited 1830 Wembley Court and departed in the white Nissan. At approximately 4:10 p.m., CHAVEZ's telephone was located within five meters of 37.40938 N latitude and 121.8675 W longitude. Once again, those coordinates coincided with the SUBJECT PREMISES. At approximately 4:37 p.m., a Hispanic male initially identified as SEGURA (later identified as CHAVEZ), was seen getting into the SUBJECT VEHICLE.

55.     Agents had to reference 2009 surveillance photographs and a 2008 DMV photograph of SEGURA to make a comparison with the driver of the SUBJECT VEHICLE. SEGURA and CHAVEZ bear some physical similarities, although there were differences between SEGURA's complexion in the

12

photographs and CHAVEZ's complexion, and CHAVEZ appears heavier than SEGURA in SEGURA's photographs. Based on the similarities between SEGURA and CHAVEZ and the reasonable belief that one's facial complexion can clear up and one can gain weight over a three year period, Agents initially identified the driver of the SUBJECT VEHICLE as SEGURA, when in fact, it was CHAVEZ.

56.     CHAVEZ departed 1830 Wembley Court in the SUBJECT VEHICLE at approximately 4:40 p.m.  CHAVEZ drove north on Wembley Court, turned left onto Cropley Avenue and then right onto Morrill Avenue.  At approximately 4:40 p.m., CHAVEZ's telephone was located within nine meters of 37.40937 N latitude and 121.8702 W longitude.  Those coordinates coincided with the intersection of Cropley Avenue and Morrill Avenue.

57.     On January 22, 2012, at approximately 5:07 a.m., CHAVEZ's telephone was located within five meters of 37.40931 N latitude and 121.8673 W longitude.  Those coordinates coincided with 1830 Wembley Court.  CHAVEZ's telephone was located multiple times in the next two hours in the same area.

58.     On January 23, 2012, at approximately 9:16 a.m., surveillance agents observed the SUBJECT VEHICLE parked in the driveway at 1830 Wembley Court.

## E.     Identification of Jorge CHAVEZ

59.     On February 7, 2012, a Federal Search Warrant was executed at 1830 Wembley Court. SEGURA was not located at the residence.  However, CHAVEZ was located in a bedroom with two other subjects.  CHAVEZ advised he had been renting 1830 Wembley Court for approximately six months with AURELIANO RIVERA.  CHAVEZ had resided at 2891 Fordham Street, East Palo Alto, California, for approximately seven years prior to renting 1830 Wembley Court.

60.     CHAVEZ advised that he and SEGURA were friends. CHAVEZ had last seen SEGURA about a month prior.  CHAVEZ advised that CHAVEZ had bad credit and that SEGURA put the Pacific Gas and Electric (PG&E) utility bill for 1830 Wembley Court in SEGURA's name.  None of the items in the

13

residence belonged to SEGURA.

61.     A broken cellular telephone assigned phone number (415) 559-2198 was located in the same room where CHAVEZ was arrested. The cellular telephone was the same telephone that was intercepted over the wiretap. Agents believe CHAVEZ purposely smashed the telephone in an attempt to destroy evidence in the telephone when the agents were executing the search warrant.

62.     Located in the driveway of the residence was the SUBJECT VEHICLE (1999 gray Chevrolet S-10, bearing California license plate number 5Y33648). The SUBJECT VEHICLE was observed previously by surveillance agents during the narcotics transactions on January 24 and January 26, 2012, when CHAVEZ met with WILLIAMS. CHAVEZ admitted that the SUBJECT VEHICLE was his and that he had allowed SEGURA to use it to move. A secret hidden compartment was later located within the interior of the SUBJECT VEHICLE.

63.     An agent who was present at 1830 Wembley Court and spoke directly to CHAVEZ confirmed that CHAVEZ was the subject in the recordings from the pole camera who met with WILLIAMS on January 24, 2012.

//
//
//
//
//
//
//
//
//
//
//
//
//

14

## VI.   CONCLUSION

64.     Based on the foregoing facts, my training and experience, and consultation with other law enforcement agents with experience in drug trafficking investigations, I believe there is probable cause to believe that CHAVEZ violated the following statutes:  Title 21, United States Code, Section 841(a)(1), distribution and possession with intent to distribute a controlled substance, Title 21, United States Code, Section 846, conspiracy to distribute and possess with intent to distribute a controlled substance, and Title 21, United States Code, Section 843(b), use of a communications facility to facilitate narcotics trafficking activities.

DATED this __th day of August 2012.

Matthew S. Beaupain
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this 2th day of August 2012.

HON. ELIZABETH D. LAPORTE
United States Magistrate Judge

15